No. 33,632

CLAUDE R. MYERS, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, *Appellant*.

(75 P. 2d 257)

Opinion filed
January 29, 1938.

*Bruce Hurd, C. J. Putt, Robert M. Clark*, all of Topeka, *W. E. Stanley*, of
Wichita, and *J. A. McDermott*, of Winfield, for the appellant.

*W. L. Cunningham, D. Arthur Walker, W. E. Cunningham*, all of Arkansas
City, *William J. Wertz, Vincent F. Hiebsch, Forest V. McCalley, Austin M.
Cowan, C. A. McCorkle, W. A. Kahrs* and *Robert H. Nelson*, all of Wichita,
for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was an action for damages for personal injuries
sustained in an automobile casualty alleged to have been caused by
the negligence of defendant. The jury answered special questions
and returned a general verdict for plaintiff for $22,500. Defendant
has appealed.

The facts, concerning which there is no substantial controversy,
may be stated as follows: The state highway known as U. S. 75
south from Topeka is paved with an 18-foot cement slab. It carries
a heavy motor vehicular traffic—about 1,600 vehicles in 24 hours;
about 150 from 6 o'clock to 9 o'clock in the morning. From a point
a short distance north of Pauline, about seven miles out of Topeka,
to a point more than a mile south of Pauline, the highway right of
way adjoins on the east the right of way of the defendant railroad
company. South of there the railroad right of way is from one half
mile to a mile from the highway as they continue south to Carbon-
dale, 16 miles from Topeka. At Pauline defendant has three tracks
—the main-line track, the east rail of which is 67½ feet west of the
west edge of the slab on the highway; east of this is a passing track
52½ feet west of the slab; and west of the main-line track is the
house track, 115 feet west of the slab. The depot is between the

main-line track and the house track. The stockyards northwest of the depot and the grain elevator southwest of the depot are on the west of the house track, and served by it. At the W. M. Myers farm, south of Pauline, the east rail of the main-line track, being the only track at that place, is 69½ feet west of the west edge of the highway slab. Even with the north line of the Myers farm, about three fourths of a mile south of Pauline station, a township road leads west from the highway U. S. 75. These railroad tracks were constructed by defendant many years ago, and since then have been maintained by it in substantially their present location, and over them defendant operates a number of freight and passenger trains each day. At Pauline defendant has no fence between its right of way and the highway, but beginning a short distance south of Pauline it has a fence, constructed of barbed wires and posts one rod apart, along the east side of its right of way, 50 feet east of the center of its main-line track. At Pauline, to the east of the depot and grain elevator, across the highway and facing west, is the old Paul residence, with a number of large shade trees in the yard so situated as wholly or partly to shade the highway slab west of them during the morning hours. At the Myers place, south of Pauline, the residence is on the east side of the highway, and about it are orchard and shade trees so situated as to shade the highway slab, or a part of it, during the early morning hours. Perhaps about half way between the old Paul residence and the Myers place there is a large billboard on the east side of the highway and near it, so situated as to cast some shade on the highway slab in the early morning hours.

On the morning of February 27, 1935, about 9 o'clock, when this casualty occurred, there was a patch of ice, or frosty ice, about 10 rods long, north and south, on the pavement directly west of the trees at the Myers place. Near the billboard there was a similar icy patch on the pavement for a short distance, and on the pavement west of the old Paul residence there was another icy place, not so long north and south as near the Myers place, but thicker in the center and feathering out to the north and south, and there the icy spot was wider on the east side of the pavement and narrowed westerly, coming almost to a point on the west side of the pavement.

On this morning a number of the officials and civic leaders of the city of Wichita desired to come to Topeka to appear at 9 o'clock before a meeting of a legislative committee at a hearing upon certain bills. They traveled in four automobiles—Mr. Wilson, chief of po-

lice, and others in the front one, a Mr. White and others in the second, plaintiff and others in the third, and two women in the fourth. While they all planned to be at Topeka for the 9-o'clock meeting, the cars did not attempt to keep together on the way. Their route brought them by Pauline over highway U. S. 75 from the south. They left Wichita about 5 or 5:30 o'clock in the morning and drove to Emporia, where they stopped for breakfast. The car in which plaintiff was riding left Emporia about 8 o'clock and reached the portion of the highway near the W. M. Myers place shortly after 9 o'clock. Plaintiff and a Mr. Cahal were riding in the rear seat; Mr. Bowery, captain of detectives of the city of Wichita, was driving, and a Mr. Middlekauf was riding in the front seat with him. Approaching the Myers place from the south the pavement was slightly rolling, and as the driver approached the icy spot on the pavement there was a slight rise, or knoll. Bowery drove over this and onto the icy part of the pavement without seeing that it was icy, at a speed estimated by him at from 55 to 60 miles per hour. The car had crossed the icy place and traveled some distance on the dry pavement, diagonally to the northwest, and left the pavement, crossed a shallow drainage ditch, and into defendant's right-of-way fence, knocked down several posts, and came to rest on its top, its front to the south. Plaintiff was thrown from the car and sustained serious personal injuries; whether sufficient to justify the large verdict in this case we need not now determine.

In his petition plaintiff alleged the injuries suffered and sustained were the direct and proximate result of the negligence of the defendant in these respects: That between the hours of 5 and 9 o'clock on the morning of the casualty, while the temperature was from 8 to 15 degrees above zero, the agents, servants and employees of defendant operated many freight and passenger trains over its tracks at Pauline, and north and south of there, and in doing so unnecessarily, wrongfully, unlawfully and negligently caused or permitted large quantities of steam and water to be discharged through the cylinder cock valves and other openings of the locomotives which they operated, and to be cast, thrown and settled on the pavement of highway U. S. 75 at Pauline, and south of there; that the servants of defendant knew, or by the exercise of due care should have known, that on account of the near proximity of the railroad tracks to the pavement, and on account of the low temperature, the water and steam so cast upon the pavement would condense quickly and form

ice; that such steam and water did condense and form ice on the pavement near the Myers place, which was concealed and hidden from view of drivers on the highway from the south by the slight rise or knoll on the pavement, until the driver was upon the ice so formed; that by wrongfully and negligently casting the steam and water from the locomotives at the time and place in question defendant caused the ice to form on the pavement, making it slippery and unsafe for travel, and that defendant neglected to enforce, and its servants neglected to observe, defendant's rule that the discharge of steam and water from safety valves, blowoff cocks and other openings of the locomotives at places where the public would suffer inconvenience thereby, must be avoided. There were allegations, also, as to the nature and extent of plaintiff's injuries.

The answer contained a general denial and specifically denied the alleged icy condition of the pavement was the result of any steam or water blown from the locomotives of defendant, and further alleged contributory negligence of plaintiff, and that he and the driver of the car in which he was riding were engaged in a joint enterprise. The reply was a general denial.

Passing the allegations respecting contributory negligence and joint enterprise, not seriously argued by defendant, the issues respecting defendant's liability formed by the pleadings were these: Plaintiff alleged that the icy spots on the pavement, above mentioned, were caused by steam and water which defendant's servants caused or permitted to escape from one or more of defendant's locomotives; that it was unnecessary for defendant's servants to cause the water and steam to escape at the times and places they did; that they were negligent in doing so, in view of the close proximity of the railroad to the highway and the low temperature; that it was done in violation of defendant's rule; and that the icy condition of the pavement was the proximate cause of the casualty in which plaintiff's injuries occurred. Each and all of these allegations were denied by defendant.

It was stipulated that the temperature, as shown by the record of the United States weather station at Topeka on February 26, 1935, showed a low of 10 degrees above zero from 4 to 7 o'clock a. m., and a high of 23 degrees from 3 to 4 o'clock p. m., and 17 degrees at midnight; and on February 27 a low of 15 degrees from 6 to 7 a. m., with an increase to 18 degrees from 7 to 8 a. m., to 22 degrees from 8 to 9 a. m., and 27 degrees from 9 to 10 a. m., and 32 degrees from

10 to 11 a. m.; and that on February 27 the wind was from the northeast, at a velocity of from 3 to 4 miles an hour, from midnight to 3 a. m., and from the south, with a velocity of 4 to 9 miles per hour, from 3 to 8 a. m., and from the southwest, with a velocity of from 9 to 12 miles per hour, from 8 a. m. till noon, and that the humidity, taken at Kansas City at 7 a. m., February 27, was 94, and that the night of February 26-27 was clear, with 100 percent sunshine for the 27th. It was also stipulated that no engines except defendant's went over its tracks near Pauline.

To show the ice on the pavement, that defendant negligently placed it there, and that this was the cause of the casualty, plaintiff produced evidence to this effect: That the pavement, other than at the three icy places mentioned, was dry. Bowery, who had come onto this pavement 18 miles south of Topeka, testified he had seen no ice on the pavement before reaching the W. M. Myers place. The two women in the car behind him testified they had not previously seen ice, and Mr. White, in the car ahead of him, never saw any ice on the pavement all the way to Topeka, not even at the three places above mentioned, and the car in which he was riding was driven at 95 miles per hour a part of this time, perhaps while passing over one or more of the icy places above mentioned. There was also testimony of witnesses who drove out from Topeka that they saw no ice before they got to Pauline. Mr. Bowery, who had had considerable experience driving automobiles, testified that south of the W. M. Myers place he was driving along at not more than 60 miles per hour; that as he approached the Myers place there were no other motor vehicles in sight on the highway; it was a slightly rolling prairie country, and at some places the pavement was higher than others; that approaching the Myers place from the south the pavement rises gradually as far north as almost to the south end of the icy place and then is slightly downgrade for some distance; that the icy place was in the lower part of the pavement to the north; that as he came over the rise, or knoll, in the pavement, from the south he could not see the ice on the lower part of the pavement to the north until his car was on it. As to what took place he testified:

". . . all of a sudden I had a sensation of spinning. In other words, the landscape just jumped before my eyes. . . . I immediately took my foot from the footfeed and held the wheel in a very firm grip because I knew I was going forward. . . . I believed I was on ice, that was the sensation, and the car was clear out of control—only thing to do was to stop, and I knew better than to put on the brakes. . . . It throws you into a skid. . . . It

happened mighty fast; we went into the ditch; I recall hitting some fence posts; they were on my side of the car, then all of a sudden blacky blackness, then my next sensation was that of crawling."

He crawled out of the car; it was then at rest on its top, the wheels in the air, headed south, as though it had turned end over end. Plaintiff was lying stretched out, apparently lifeless, on the ground north of the car. Mr. Cahal was lying south of the car toward the railroad embankment, and south of him was Middlekauf, who died later that day of his injuries. Bowery, though stunned, was attempting to do something for the others. He looked back over the pavement and saw ice glistening thereon. About that time Mr. De Long came. Mr. De Long was a highway patrolman. He had started to Emporia from Topeka that morning. At Pauline his car had skidded a little on some ice, but directly righted itself. He saw no ice on the pavement before reaching Pauline, and did not see ice there until his car skidded, and he thought he might not have seen it if his car had not skidded a little. Soon after he passed Pauline, and when about half a mile north of the Myers place he saw the car driven by Bowery "make this last turn. . . . The car completed a turn and came to rest." (Some evidence tends to show it turned over more than once.) He drove on to the scene of the casualty, saw the car, the three men on the ground, and Mr. Bowery standing up, apparently dazed. He did not get out of his car at that time, but turned around and went back to Pauline and reported the accident by telephone to the state highway headquarters at Topeka and asked them to send an ambulance, and also to send Mr. Lomax with a camera. It is stipulated the ambulance was called at 9:18 o'clock. De Long returned to the scene of the accident. By that time traffic was becoming congested. He and two other highway patrolmen who came about that time busied themselves directing traffic and taking the names of those who they thought knew something about it. Among the names taken were W. M. Myers, who was not called as a witness for plaintiff, and A. R. Bosch, and his son Walter, who testified, by deposition, to this effect: Early that morning they had gone to some timber about three quarters of a mile west of the Myers place and cut a truckload of wood. At some time while they were cutting wood they heard a train whistle to the east of them. Mr. Bosch did not take time to look to see it. Walter looked, but saw only a glimpse of a moving train, not enough to tell whether it was a freight or passenger train, or which way it was moving. They were

there about two hours. They had got their load, had stopped at a farm house to put water in their radiator, and had driven east on the township road, above mentioned, to U. S. highway 75, reaching there after the accident, but while the bodies were on the ground and before the ambulance came. They were stopped before they entered U. S. highway 75 by a highway patrolman, who took their names. They got out and looked around. Mr. Bosch examined the icy place on the pavement. It was south of where the township road entered U. S. 75. Perhaps the strip was 100 feet long. He thought that would be a pretty fair estimate, but did not measure it. It looked "whitish" or "frosty" in the thickest part of it, but gradually tapered off to look more like ice as it got thinner. He saw some ice on vegetation, some on the west and some on the east side of the highway, but did not pay much attention to it. Walter testified the strip of ice on the pavement was about 100 feet long, with the north end of it near the township road. He did not notice ice on the vegetation near there. He had never seen any locomotive blow steam across the highway along this area. Both of them testified they saw two or three icy places on the pavement between there and Pauline.

Mr. Lomax was an assistant attorney for the state highway commission, whose special duty was to prepare defenses in damage actions brought against the commission on account of defects in state highways. He had investigated a number of highway accidents. Promptly on De Long's report by telephone of the accident Lomax's superior directed him to take his camera and go to the scene of the accident and make an investigation. He got Mr. Dean of the department to drive him out there, but first had to go to his residence for his camera and equipment. They drove south on U. S. 75, and near the south edge of Pauline, while traveling 70 miles per hour, the rear wheels of the car skidded a few inches on ice. He had seen no ice on the pavement before reaching Pauline, and did not see it there until the car skidded. He then began to watch, and about a quarter of a mile south of Pauline saw a similar streak of ice, and another south of the township road. He thinks he passed the ambulance as he went out. On reaching the scene of the casualty he parked his car on the east side of the highway. The ambulance had gone. De Long and two other highway patrolmen were there directing traffic. Other persons were there. He first examined the highway to see if there were ruts adjoining the pavement, a hole in the road, or

anything that might result in an action against the highway department. He made several photographs, counted fence posts, estimated distances, and looked at the ice on the pavement. The icy strip was about ten rods long. The north end of it was about the south line of the township road, which enters U. S. 75 from the west. The ice was a thin coating, but very slippery, really hard to walk on. At the north edge it was perceptibly thinner, not a solid coating; in the center it was solid, and at the south end it feathered out again. It was directly west of the trees at the Myers place. There were fruit and shade trees close to the highway, and these cast some shade on it during the early morning hours, though bare of leaves. He saw the wrecked car and traced its tracks back to where it had left the ice. From there the tracks bore to the west of north diagonally across the pavement and left the pavement about four rods north of the ice. From there on, when it first hit the shoulder of the highway, it looked as though they had been sliding. There was no indication of any skidding. The tracks went down into the ditch and up the back slope. The car hit the right-of-way fence, eight posts north of the township road, and followed north along the fence 15 rods, to where it came to rest. In doing so it broke off or tore out as many as twelve fence posts and became entangled in the barbed wire; had wire and one post clinging to it where it rested. Having satisfied himself there was no defect in the highway which made the highway commission liable, and having talked with some farmers about how the ice might have got on the pavement, he returned to Pauline and inspected the ice there. He found the icy patch there to be about 30 feet long north and south, in the center of the pavement, wider on the east side and narrower on the west. It was shaped much like a cone, or pyramid, with the base to the east. Ice showed on the weeds and grass between the highway and the railroad track up to within 8 or 10 feet of the track, and this was a continuation of the cone shape of the ice on the highway, and became narrower until only a few feet wide nearest the railroad. He took three photographs, one from a position on the railroad track south of the depot and north of the elevator, with the camera pointed east toward the old Paul residence; one from the east side of the highway, with his camera pointed a little south of west toward the grain elevator, and another near the south edge of the ice, with the camera pointing west of north. These pictures show what appears to be ice on the pavement, but do not show any cone-shaped patch of ice on weeds and grass. There was a

telephone pole between the railroad track and the highway, and the testimony was that there was a thin film of ice on the west side of that to about the height of a man's head, but none on the east. The photographs do not bring that out, or the cone shape of the ice on the vegetation. With respect to these things Mr. Lomax thought the photographs not very good. De Long was present when these photographs were taken and the investigation made. His testimony was substantially the same as that of Mr. Lomax, but perhaps more clearly brought out the fact that all the ice they observed was east of a line or point 8 or 10 feet east of the passing track, the east rail of which was 52½ feet west of the west edge of the slab. Mr. Lomax further testified that there was some ice along the shoulder of the ditch on the east side of the highway slab. They then went south and inspected the icy place at about a quarter of a mile south of Pauline. This was about 40 feet long north and south, a little heavier to each end than in the center, but not as heavy as at Pauline or at the Myers place. Mr. Lomax got out of the car and walked over near the right-of-way fence and observed some ice on the grass and weeds. He did not examine the fence posts for ice, and there was no telephone pole there between the pavement and the railroad track. He returned and further inspected the icy condition near the Myers place. He observed the fence posts between there and the railroad and that on possibly six of them, near the center, each had a thin film of ice on the west side but not on the east. He saw no ice on the fence posts west of the north or south end of this icy strip. He walked over to the railroad track on the township road and south on the track perhaps 100 feet, and looking east he could see ice on the grass and weeds, especially the taller ones. Looking west he could see no ice on the vegetation.

Mr. De Long had traced the tracks of the car back as much as 100 feet from the north edge of the ice, perhaps before Lomax came. At the time he did this the tracks were plainly visible. At a place about 100 feet south of the north end of the icy strip the car apparently had been traveling on the east side of the pavement, but at that point the tracks indicated a "slight skid," and from that point had taken a direction a little west of north diagonally across the pavement and in a straight line across the remainder of the strip of ice, and on until the car had struck the fence, as testified to by Lomax.

Judge Somers and Mr. Branine, of Newton, driving north on high-

way U. S. 75 soon after the casualty, noticed the ice on the pavement. Asked to describe it, Judge Somers replied:

"As I remember it we came over a rise and there were irregular patches of, oh, icy frost, stretching across the pavement, a patch, say, twenty-five or thirty yards long. There would be a clear space, then another patch of irregular outlines from the top of this rise down to where this car was turned over.

"Q. Did your car skid? A. Yes. On the first ice I noticed."

They drove on in to Topeka and in doing so noticed other patches, the same as they had been passing, about every 100 yards or so, until they got to the underpass. This is about a mile and a half north of Pauline. He noticed none north of the underpass and had noticed none on the way before seeing the ice near the casualty.

Mr. Branine described it as follows:

"We came up over a little raise or knoll in the highway. Just on the other side to the north of the knoll we saw the group of cars and the state highway patrolman, and automobile overturned. We slowed up, asked what happened. Right at that point where we stopped there was a strip of ice on the pavement.

"Q. About how large was that strip as you remember? A. As nearly as I can estimate it from memory it would be, I would say, twenty to thirty feet.

"Q. That is north and south? A. Yes, sir, the width.

"Q. The width of the highway? A. Yes."

He saw some icy spots or strips of ice across the pavement after he left the scene of the accident and proceeded toward Topeka. He did not recall definitely how many; anyway, two or possibly three. They were south of the underpass.

Mr. Oldham, an oil-truck driver, left Topeka that morning on U. S. 75 to go to Wakarusa, south of Pauline. Shortly after he had gone through the underpass about a mile and a half north of Pauline he saw a train at Pauline "blowing steam out across the highway." The train was going south and was just leaving Pauline. It looked like a passenger train and had what appeared to be a white emblem on the back, such as defendant has on some of its passenger trains. He stopped a few minutes at a house before he got to Pauline. At Pauline he noticed ice on the pavement just south of the depot, because his car swerved. He had not seen it before his car hit it. As he went on south he noticed two more icy places on the pavement. At the first of these his car did not swerve—he was watching; the next one was near the scene of the accident. When he reached there De Long and Lomax and others were there. He testified the injured men were still there and that he left soon after they were

placed in the ambulance, but as to this he was probably in error. He described the ice near the Myers place as being south from the Myers' mail box, about 100 feet south of the township road, and to be about 10 rods long north and south, and that he observed there was ice east of the highway clear out on the wheat stubble and west to within 10 or 12 feet of the railroad track. It does not appear that he went off the highway. He had noticed no ice on the pavement that morning before he reached Pauline nor after he passed the Myers place in going to Wakarusa.

Mr. Bowery, recalled, testified that from 1923 up to and including a part of 1928 he was employed as a boilermaker for the Orient railroad, in its shops at Wichita, and continued to work for a few months after defendant had purchased that railroad. He was familiar with the engines then used and the construction of the boilers thereon, which he described; that the steam pressure of the engines varied from 75 to 225 pounds per square inch; that water can be released from the boilers of engines through what is termed "blowoff cocks." These are located one on each side of the engine, near the center, slightly above the mud ring and near the lower part of the water-carrying space in the boiler. The valves of the shutoff cocks do not operate automatically, but are opened by a lever, which the engineer or fireman pulls and holds as long as he wants the water to run. They have an opening of about an inch and a half. When the blowoff cock is open water and steam are thrown out by the pressure of the steam in the boiler. He has seen it cast out as far as from 150 to 200 feet. These are sometimes opened while the train is running, to clean out the sediment or the settlings, whatever they may be, near the bottom of the boiler. He thought some of the engines he worked on were still being used on the Santa Fe, but they were not the large engines used at the present time; but he had looked over some of those engines, either in the yards or as he drove along near the tracks, and thought they all had blowoff cocks. He was not familiar with mufflers for blowoff cocks now used on some engines.

The testimony of J. D. Kabler, a chemist, given at a former trial in Sedgwick county, was permitted to be read to the jury. We pass by the questions argued by defendant on its objections to this testimony without deciding them. He was asked to tell the jury briefly about steam—as to what effect temperature has on it. He replied:

"What you see visibly is really not steam. It is water vapor made up—condensed into extremely small drops, many of them microscopic, of water. Steam in itself is not visible. It is a released gas the same as air. . . . On escaping from a condenser of any kind into the air surrounding it, it expands and condenses with a formation of small droplets of water and water vapor which are then visible. That is what is ordinarily called steam, but is really not steam. . . . It will freeze quicker than water, for two reasons, because, first, the particles are extremely small, lose their inherent heat very fast, and, secondly, because since it is steam there are no solids in solution to lower the freezing point."

He was asked:

"Assuming that a locomotive blew off steam from the side so that it traveled a hundred or a hundred and fifty feet across the paved highway, commencing about 60 feet from the locomotive, and the temperature at that time was from 18 to 22 degrees above zero, how long, in your opinion, would it take that vapor to be transformed into ice? A. Traveling—that condensed moisture traveling through the air at that distance would freeze at those temperatures almost instantly. It very rapidly loses the heat, the steam as it expands in the air. Steam, being a gas, gives off heat rapidly—very soon—almost instantly becomes the temperature of the surrounding atmosphere, and would freeze almost instantly."

He was also asked the question and gave the answer as follows:

"Assuming that a train was moving slowly on a morning when the temperature was 18 to 22 degrees, about sixty feet from a paved highway; the night had been cold and the engine would blow off this vapor so that it would pass clear across the highway some 18 feet in width, will you state to the jury whether, in your opinion, that vapor could have caused a coating of ice upon the pavement, oh, less than a quarter of an inch in thickness? A. I think it would. It would form a coat of ice on the pavement."

He did not know the amount of steam that blows off from a locomotive in the space of three seconds, had never measured it, or attempted to. He had never attempted to weigh the amount of moisture flowing on any object at any stated distance away from a locomotive where the steam had been blown off. He had made no tests with reference to the amount of moisture that would be sprayed upon any area blown off from one locomotive moving ten miles per hour. He knew nothing of the temperature of the water inside the boiler at the time when water is blown off, but expressed the view that the higher the temperature the greater the pressure of the steam, and the faster it would come out the finer the particles would have a tendency to be, but these particles would not show in the air until the temperature of the vapor had been reduced below the boiling point of 212 degrees F. He made it clear he did not pretend to

testify to actual amounts, but merely to what steam would do, and when it came in contact with the air of the temperature mentioned that it would freeze.

We understand from the record defendant's objection to the question last quoted and its motion to strike the answer on the ground the witness had not shown himself competent to answer it intelligently, tentatively overruled, was later sustained, as it should have been. In any event, his answer to the question had no value as evidence. The witness had conducted no tests, had no experience, and was in possession of no facts which would enable him to answer the question intelligently. The fact that he was a chemist and knew what intelligent persons generally know—that steam itself is an invisible expansive gas; that when liberated in air, in a temperature less than 212 degrees F., it expands in every direction and condenses in minute droplets which float in the air as a cloud or fog—standing alone, did not qualify him to say how much of the moisture contained in such steam would fall to the earth at any particular place, or that it would form ice at any particular place. He could not know that unless he knew the amount of water in the steam liberated, and other facts, which he was free to say he did not know. His answer to the question, either "yes" or "no," proved nothing.

Plaintiff introduced in evidence paragraph 466 of the rules and regulations of the operating department of defendant, in force at the time. This reads:

"Excessive smoke and escape of steam should be avoided. Blowoff cocks, cylinder cocks or injectors must not be opened when damage to property or injury to persons may result."

We have attempted to state, as concisely and as accurately as possible, all of the material evidence offered on plaintiff's behalf except that pertaining to his injuries, on which point defendant offered no evidence. In doing this we have not confined ourselves to the abstracts and briefs, but have read, and reread, the transcript. We find no evidence that any engine of defendant's blew off any steam or water at Pauline, or within a mile south of there at any time, except the testimony of Oldham, and evidently what he said about escaping steam at Pauline was after the casualty, as was thoroughly demonstrated later in the trial and is now conceded. Having failed to show that any steam or water was thrown or permitted to escape at the place in question prior to the casualty it necessarily follows plaintiff also failed to show that defendant's

servants negligently caused or permitted it to escape, and that steam and water from defendant's engines formed ice on the pavement, and that such ice was the proximate cause of the casualty.

Defendant's demurrer to plaintiff's evidence was overruled and defendant introduced its evidence, possibly with the view it could demonstrate with certainty its lack of liability. The demurrer should have been sustained. Plaintiff, as appellee, says that is no longer important because defendant went forward with its evidence and supplied all the evidence omitted by plaintiff essential for his recovery. Defendant contends it did not supply such missing evidence. This requires us to examine defendant's evidence.

Defendant undertook, by two lines of testimony, to show that such icy condition of the pavement as existed at any of the places mentioned was produced by natural causes and not by any water or steam that escaped from any of its engines. It produced a number of witnesses who lived in Topeka, or south of there near highway U. S. 75, as far as Carbondale, sixteen miles south of Topeka, most of whom had traveled over that portion of the highway in question that morning, who testified that early that morning there was exceptionally heavy, icy frost on the tops of automobiles that stood out over night, on the pavement, on grass, weeds, shrubbery and posts; that this was so heavy that cars would slip or skid a little on it; that after the sun came up this disappeared rapidly where exposed to the sun, but stayed longer where protected by shade. One witness, who came over this highway from Carbondale to Topeka just a few minutes before the casualty, learned of it on reaching Topeka and immediately recalled his trip over the road and the number of patches of frosty ice on the pavement. He testified to fourteen such places where the pavement had been protected from the early sun's rays by trees, buildings or other structures near the pavement. Each of these still had heavy, frosty ice as he drove over them, but the pavement was dry where the sun's rays got to it. Other witnesses testified to several such places other than the three mentioned by plaintiff's witnesses. Defendant argues this was positive evidence which should have been given more weight than the negative evidence of plaintiff's witnesses, who simply said they did not see such places. To further establish this point defendant offered scientific evidence to this effect: That the surface of the earth, with stones and pavement thereon, is more sensitive to heat or cold from the sun's rays, or absence of them,

than the air above; that it cools more quickly when the sun goes down and warms up more rapidly when the sun rises; that warm air may contain a greater moisture content than cool air; that when the air contains a large moisture content, as shown by a high relative humidity, and the sky is clear and there is little or no wind, when the sun goes down and the surface of the earth cools first and the air later, the moisture content of the air settles on the earth in the form of dew if the temperature is above freezing, in the form of frost if the temperature is below freezing, and that such frost will form on stone, pavement, grass, weeds, shrubbery or posts; that if there is any wind at all this would form heaviest in the places protected by trees, shrubbery, buildings and other structures, and upon the rising of the sun in the morning the frost exposed to the sun's rays would disappear readily, the moisture of which it was composed returning to the air as vapor, and that the frost protected from the sun's rays would remain longer; that it would be possible for this frost to disappear under the sun's rays and by the action of the wind even though the temperature were below freezing, and that the temperature, humidity and weather conditions stipulated as existing on the night of February 26-27 were ideal for the formation of such a heavy icy frost, and that the sunshine and breeze in the morning of the 27th would cause this icy frost to disappear at places exposed to the sun's rays, and to remain where not so exposed. Reading the transcript of the testimony of these witnesses, nothing appears to suggest any reason for not giving their testimony full credence. However, the weight to be given that testimony was for the jury and trial court and is not for this court.

Defendant then undertook to show that it would be impossible for steam and water thrown, or permitted to escape, from the boilers of its engines through blowoff cocks to form ice such as some of plaintiff's witnesses testified was on the pavement. Defendant does not contend that the moisture which escapes from such blowoff cocks does not at times extend as far as 150 or 200 feet from its engines in the form of the small droplets as a cloud or fog, but does contend that the quantity of it which does or may reach the ground or pavement is entirely too small to form such ice. With respect to that a witness, who had tested many times the amount of water which in the form of steam and water would escape from blowoff cocks used on defendant's engines on this line, explained how such tests were made and testified that five gallons

per second was the maximum of water discharged when the blow-off cock was open. Another witness, whose qualifications were not questioned, had made a test to see how much of the moisture which escaped from the open blowoff cock would reach the ground or pavement at distances from the engine varying from 25 to 80 feet. He described the test made and his findings, which were to this effect, that of the moisture which escaped from the blowoff cock only 22 percent of it reached the ground within the distance of his test, the remainder remaining in the air as a cloud or fog and being drifted to some other place, or eventually taken up in the air; that of the amount which reached the ground the greatest part of it did so within 60 feet of the engine, and that the amount which would fall upon a given space as much as 79 feet from the engine did not exceed three thousandths of an inch, and that this was entirely too small a quantity to make any film of ice on the earth or pavement. The evidence offered by defendant on these points was not controverted by any evidence offered by plaintiff. Its weight, of course, was for the jury and trial court.

Defendant then showed the movement of its trains over its line through Pauline from midnight until after 10 o'clock a. m. on February 27. Its only west (south) bound passenger train during that time was train No. 5, known as the "Ranger," due at Pauline at 9:40, and which went through there at 10:05 o'clock. This must have been the train Oldham saw and tends to fix the time he arrived at the scene of the casualty. The engine of this train was equipped with a muffler over the blowoff cock, so designed as to carry the force of the water and steam permitted to escape down the side of the engine and back under the cab, where it was discharged. The only "steam" Oldham could have seen must have consisted of the small droplets of moisture spoken of by the expert witnesses, which floated in the form of a cloud or fog through the air. It is not now contended on plaintiff's behalf that any steam or water which escaped from the blowoff cock of this engine caused any ice on the pavement or elsewhere. Of the eastbound passenger trains within the time mentioned, the whistle of which could have been heard by Mr. Bosch and his son, was train No. 26, due through Pauline at 7:30 a. m. There is no contention on plaintiff's behalf that the blowoff cock of this engine was open at any place near Pauline, or that any moisture permitted to escape from that engine caused any ice on the pavement.

Between midnight and 10 o'clock a. m. on the day in question there was one east (north) bound freight train over the track near Pauline. This reached Topeka at 2:45 a. m. and passed through Pauline ten or fifteen minutes earlier, but it is not contended water and steam were permitted to escape from its engine anywhere near Pauline. Within that time there was one west (south) bound freight train, known as 91-Z. It reached Pauline at 5:10 a. m. and left there at 5:58 a. m. It is conceded that the blowoff cock of the engine of this train was opened and water and steam escaped therefrom at Pauline. The only witness who testified about that was the fireman, E. H. Hagelberg. We summarize, or quote the pertinent parts of his testimony, as follows:

The train contained 38 freight cars. Two of these next to the engine were to be set out at Pauline, and the train was to wait there for an east (north) bound passenger train, No. 28, to pass. The train came in on the passing track and pulled toward the south end of it until the engine was 50 or 75 feet north of the block signal. The passing track at Pauline is the one nearest highway U. S. 75 and is long enough to hold 61 freight cars. There the train was disconnected back of the two cars to be set out. The other 36 cars were left standing on the passing track. The engine with the two cars to be set out was moved forward onto the main track, then backed onto the house track. This is the track west of the depot which serves the elevator and stockyards, the east rail of which is 115 feet west of the west edge of the pavement on the highway. The two cars were spotted somewhere west of the depot. While on the house track and backing the two cars, or pulling away from them, the witness opened the valve of the blowoff cock. The witness testified:

"I had a little bit too much water in the boiler; I blowed out possibly an inch of water out of the boiler.

"Q. At what point were you when you blew it out, . . . right close to the elevator somewhere? A. Somewhere along there.

"Q. Was this train which you left standing on the siding between that spot and the highway? A. Yes, sir. . . .

"Q. Was the train moving when you let off this steam? A. Approximately eight or ten miles an hour. . . . Yes; you know, just coming out of the house track.

"Q. How many seconds at a time did you blow off, and how many times— explain how you did that. A. I blowed it about three or four times then— blow three or four seconds, blow off a second or two—it is hard to regulate exactly.

"Q. There is some little interval between blowoffs? A. Yes.

"Q. Where were you by the time you gave the last blowoff? A. Some place in here [designating]; we was moving slowly—only covered a short distance—hadn't got over to the main line.

"Q. You hadn't left the house track then? A. No.

"Q. Then you moved out on the main line? A. Yes, sir."

The engine was then moved forward onto the main line and backed onto the passing track, where the train was connected. It then waited perhaps fifteen minutes until the passenger train passed. It then pulled out on the main line and proceeded southward (west).

"Q. At that time, or during that time, did you blow off any steam? A. No, sir.

"Q. Or open the blowoff cocks? A. No. . . .

"Q. Did you blow off any steam at that point or within the mile or two next south of that point? A. I didn't blow off any more until after we had passed Wakarusa.

"Q. How far is Wakarusa south of Pauline—do you know, about? A. I think the timetable says five and some tenths miles; I don't know exactly.

"Q. Where was that place—can you designate where you blew off more steam, locating it by a grade, or a creek? A. The best location I can give— we are down grade after we leave Pauline, practically down grade all the way to Wakarusa; the engine doesn't work much, you have to work the water pump quite a bit going down grade to keep the water inside the locomotive, you know; after you pass Wakarusa you start up quite a steep grade and the engine has to labor quite a bit to get the train up there, so you have to reduce the water pretty well—have to blow some water out on that account.

"Q. On account of approaching or starting up a grade? A. Yes.

"Q. That is this place here? A. Blowed her out after leaving Pauline.

"Q. Between that point, at this place by the depot, you had not blown out your side of the engine at all? A. No."

Coming out of Topeka to Pauline it is upgrade and he opened the blowoff cock several times between Topeka and Pauline. The engine of this train had no muffler on the blowoff cock.

"Q. I am talking now about Pauline; you testified that you blew out, opened the blowoff cock several times at Pauline? A. Three or four times is usual at Pauline.

"Q. Your engine would be foaming, is the reason you did that? A. No, I didn't state that; I said my water level was too high, so I reduced the water in the boiler about an inch, which I did.

"Q. What was the reason you did that? A. So I could get the water down so I could put the injector on and not have too much water in the boiler.

"Q. You knew that after you left the siding and started up on the main line after 28 passed you started out with a grade? A. No grade that I noticed.

"Q. It is up grade there for a ways instead of down grade? A. From where the engine was at the time there is no grade, practically, to my knowledge, for any distance—it is practically level, then down grade on to Wakarusa. . . .

"Q. If an engine sets a while after laboring up a hill it is a good idea to blow them off, isn't it? A. If you have to work the engine to any extent.

"Q. Yes. On leaving Topeka and having worked the engine hard for 30 or 35 minutes, then you set out for twenty minutes, it would be a good idea to blow off before you start working it again, would it not? A. If the conditions permit it could be done.

"Q. It is ordinarily done, is it not? A. If the boiler needs it.

"Q. There would be nothing unusual about that? A. No.

. . . . . . . . . . . . . .

"Q. Now then, when you backed in there and left the two cars near the depot and elevator, that is when you blew off your locomotive? A. Yes.

"Q. You opened the blowoff cock? A. Three or four times.

"Q. Three or four times. Did you pull it wide open? A. Yes, sir.

"Q. When you jerked it wide open that shot steam out to the east? A. Yes.

"Q. As a matter of fact it is really hot water, rather than steam, that comes out? A. Water in the boiler—when it hits the air it is practically steam.

"Q. It is really hot water that comes out? A. About 380 degrees Fahrenheit.

"Q. How much pressure is there in your boiler? A. Two hundred pounds approximately, 195 to 200.

"Q. How big is the blowoff cock opening? A. My judgment, it is supposed to be about a two-inch pipe.

"Q. Your engine was equipped with the usual and ordinary size blowoff cock and opening? A. Just a straight blowoff.

"Q. What kind of a lever is there in the cab of the engine for this blowoff valve? A. I don't remember just what they call them—it is a lifting lever that works—when you take hold of it inside the cab—it has got a safety lock over it, you have to raise the safety lock with one hand and take hold of the lever and pull it open; it comes all the way open, and when you let go it goes all the way shut. . . .

"Q. That safety lock keeps the blowoff cock from opening unless the engineer or fireman wants it open? A. That's right.

"Q. Nothing automatic about that blowoff valve? A. No. . . .

"Q. How long did you hold that blowoff cock open the first time? A. Practically two or three seconds, I would judge, something like that, possibly four; I don't know, I wouldn't state how many seconds—that isn't very long.

"Q. Two or three or four seconds. Then you closed it, I understand? A. Yes.

"Q. Then you opened it again? A. Yes.

"Q. For two or three or four seconds. Then closed it again, then opened it again for two or three or four seconds? A. Yes, sir.

"Q. Did I understand you to say you blew it off three or four times? A. Yes, I think, approximately—wouldn't say for sure.

"Q. But it was three or four times. When you blew that off was right about the time you had left these two cars at the elevator or depot? A. Somewhere around the station.

"Q. Somewhere around the station? A. Mark the depot. . . .

"Q. At the time you were here by the depot or elevator and opened the blowoff cock, were you moving or stopped? A. Moving.

"Q. Did you open the blowoff cock just as you started to pull away from the box cars? A. I don't know, we were moving; that is all I can tell.

"Q. So far as you know you might have just backed in, the brakeman uncoupled the cars, gave you the go-ahead signal, whatever he did—that would be about a good time to blow it off, wouldn't it? A. Just what do you mean, good time to blow it off?

"Q. Well, the brakeman, you would know where he was and he wouldn't be in danger? A. Sure I wouldn't blow off with him going right by the side of the blowoff cock.

"Q. You have a rule not to open the blowoff cock around a depot or along a road, anything of the kind? A. I what?

"Q. Isn't there a rule of the Santa Fe telling you not to open the blowoff cock around the depot, highways, horses, or employees—something of the kind? A. Well, they leave that to the man working it; of course a man ought to use judgment; I don't know as to any rule about using the blowoff cock if we have to use it. . . .

"Q. After you had blown off your engine, when you got into Pauline and backed two cars up there, then you go back up, come back in on the siding and set there for fifteen or twenty minutes, whatever time it is, then you started to pull out to go south to Wakarusa? A. Yes, sir.

"Q. I believe you say you blew off your engine again? A. No.

"Q. How do you recall that you did not? A. I know I didn't; I didn't have to, didn't have enough water that I needed to blow off."

Later in the day, while at Osage City or Emporia, the witness learned of the accident in which plaintiff was injured and was asked to make a report to his superior officer of the manner in which he had handled the engine that day, and did so.

Defendant also undertook to show that the icy condition of the pavement near the W. M. Myers property was not the proximate cause of the casualty which resulted in plaintiff's injury, and with respect to this two points are noted. One was the rise or knoll in the pavement directly south of the icy place which prevented Bowery, the driver of the car, from seeing the icy spot until his car was on it. This was stressed by plaintiff in his petition, opening statement, and by the testimony of Bowery and several other witnesses called by plaintiff, and found by the jury in answer to a special question, the inference being that had this rise or knoll not been in the pavement Bowery would have seen the icy place and so handled his car as to have avoided the casualty. There is no contention defendant was responsible for this rise or knoll in the pavement. It is a condition common in pavements laid over a slightly rolling country. The other point is, from the evidence it is clear the car did not spin on the icy place near the Myers farm. The witness De Long traced the tracks of the car, then clearly visible, southward

to a point 100 feet or more south of the north end of the ice. There the tracks indicated a "slight skid," and from that point the tracks were straight in a course a little to the west of north until the car left the pavement. The witness Lomax traced the tracks back from where they struck the right-of-way fence eight rods north of the township highway, to where they left the ice on the pavement, a short distance south of the south line of the township highway. He did not attempt to trace the tracks farther south, because by the time he looked at it he thought enough cars had gone over the icy place to make it difficult to trace the tracks, but for the distance he traced, the car moved in a straight line. There was no skidding, although the tracks indicated the wheels were sliding in the mud as they crossed the shallow ditch west of the pavement. Only one other witness, W. M. Myers, called by defendant, testified to the course the car took. He was in the backyard at his place. He heard a car coming rapidly from the south and looked up and saw it perhaps when it traveled a part of the time on the icy place. His view was obstructed part of the time by his residence and other buildings, so he could not observe the car all of the time after it first came over the little rise or knoll until it ran into the fence. At some point, a little difficult to locate from his evidence, but while the car was on the ice, he thought it was traveling near the center of the pavement, and that it first turned slightly to the right until the right wheels were within a foot of the east edge of the pavement, and then turned to the west of north and followed a straight course until it struck the right-of-way fence. This may be the same point spoken of by De Long as where the tracks indicated a "slight skid." But from all of the testimony offered by either side it is clear that for a distance of approximately 100 feet on the icy place, and more than that far north of it, the car had traveled in a straight line until it struck the fence. Defendant produced the testimony of several experienced drivers of automobiles that this would not have happened if the ice was the cause of the casualty; that if it had been caused by ice the car would have spun immediately while it was on the ice, and that the mishap, whatever it would have been, would have happened there and not after the car had gone on a straight course more than 200 feet. Other evidence on this point was to this effect: When the automobile came to rest, with its wheels in the air, the left front tire was flat—all of the air was out of it. The tires on the other three wheels were up, apparently full of air.

Soon after the casualty the car was moved to a garage in Topeka. There an experienced automobile man in charge of the garage examined the left front tire and found it flat and could see no cut or hole from the outside, which would cause it to go flat. Soon after it was taken to the garage Mr. W. E. Wilson, chief of police of Wichita, appeared at the garage and gave directions in accordance with which the automobile was taken upstairs and covered with a tarpaulin, and the garage man permitted no one to see it. Defendant's theory was that the tire went flat from some cause while the car was on this icy place. It offered evidence that a flat front tire pulls the car to that side, and experienced witnesses testified that if the tire had gone flat while the car was on the ice it would have pulled the car to the left and off the pavement—in a course this car took—if it was not stopped, or if the driver was not able to hold the car on the road. As to this it is argued for plaintiff that the left front tire was the first to strike the barbed wire in the right-of-way fence, and there is no wonder it was flat; indeed, it might have been cut all to pieces. It would not have been surprising to have found a cut or hole in the tire made by the fence, but the only evidence on that point is that there was no such cut or hole. While plaintiff should not be held responsible for Mr. Wilson's giving directions which prevented a more careful examination of that tire, the fact remains that no further examination of it was made, or if made, the result is not shown by this record. Certainly, if the casualty occurred because of the rise or knoll in the pavement, or if the air suddenly went out of the left front tire for some reason, defendant would not be responsible, even though its engine threw the water on the pavement which caused the icy condition.

As to this point it was argued for plaintiff that there may be two or more proximate causes of the casualty; hence, even if the things just mentioned be regarded as proximate cause, or proximate causes, of the casualty in which plaintiff was injured, that alone would not relieve defendant of liability. For the purposes of this case, that may be conceded to be true, but even so, that does not relieve plaintiff from proving defendant's negligence was a proximate cause of the casualty.

Counsel for plaintiff correctly point out that insofar as the testimony of defendant's witnesses differs from that of plaintiff's, there was presented only a controverted question of fact for the jury to

decide, and the fact that it chose to believe plaintiff's witnesses rather than those called by defendant is not a reason for reversing the judgment. As to the testimony of defendant's witnesses on points not covered by witnesses offered by plaintiff it is argued the jury was not required to believe that testimony, even though it was uncontradicted. While this principle is not of such universal application as the one just previously stated, it has been recognized at times, and since it is the view most favorable to the plaintiff we shall permit it to be applied here without analyzing the point as to whether it is proper to do so. The fact that the jury chose not to believe uncontradicted evidence offered by defendant would not, however, justify the jury in reaching a conclusion directly opposed to it, with no evidence at all to support the conclusion reached.

Counsel for plaintiff, as tending to supply the deficiency of proof in his behalf, say defendant admits its servant threw water and steam on the pavement near Pauline, there was ice on the pavement near Pauline, the water and steam thrown on the pavement caused the ice at that place, the icy patch a quarter of a mile south of there, and also the one along by the W. M. Myers place was the same kind of ice as was on the pavement at Pauline; that defendant's witness Hagelberg testified he "blowed her out after leaving Pauline," meaning that he opened the blowoff cock and let water escape from his engine; that this must have been done as he passed by the W. M. Myers place; hence, it is argued it is established by defendant's own admission that it caused the ice to be formed near the Myers place. The evidence does not support this line of reasoning, or the conclusion. Any "admission" of the defendant on this point must be found in the testimony of Hagelberg. We have summarized or quoted all of that which is pertinent. He testified that he did let water out of the boiler through the blowoff cock by opening it as many as three or four times, from two to four seconds each time, while the train was moving at from eight to ten miles an hour on the house track, 115 feet west of the west edge of the pavement on the highway, and from 115 to 130 feet west of the ice on the highway, and at a time when a train of freight cars was standing on the passing track between the engine and the highway. There is not a particle of evidence on behalf of plaintiff that it would be possible for the water which this witness testified he permitted to escape from his engine at Pauline to form any ice on the pavement that far away and under those circumstances. Certainly

there is none to that effect on behalf of defendant; in fact, its evidence tended to demonstrate it would be impossible. So, while it is true defendant admitted letting water escape from the engine at Pauline, it is not admitted that the ice on the pavement was formed from the water which so escaped, and there is no proof in this record that it did. Hagelberg testified positively that he did not open the blowoff cock and permit water to escape from his engine after he left the house track at Pauline until he was going up the grade south of Wakarusa station, more than five miles away. Counsel for plaintiff repeatedly call attention to the expression once used by Hagelberg that he "blowed her out after leaving Pauline," and argue that this is an admission by him that he opened the blowoff cock and permitted water to escape from the engine in the vicinity of the W. M. Myers place. We have carefully read the transcript of the direct and cross-examination of this witness and find that this is an inaccurate interpretation of his testimony. As we read this evidence the oft-quoted phrase clearly refers to when he was going up the grade south of the station at Wakarusa.

Neither can it be said that the circumstances under which Hagelberg testified having opened the blowoff cock of the engine were in violation of rule 466 of defendant, nor that it was negligence for him to do so at that time. He stated the reasons why it was necessary. It is not seriously contended these reasons were not good. There is no suggestion in this record that he should have anticipated that ice would have been formed on the pavement by his causing the water to escape from the engine at the time and place and under the circumstances he did so.

W. M. Myers, called as a witness for defendant, on cross-examination was asked, among other things, if he had not told Mr. Lomax, Mr. De Long, W. E. Wilson and others with him from Wichita, that the ice near his place was caused by water which escaped from one of defendant's engines, and answered that he had not made that statement. In rebuttal these persons were called by plaintiff as witnesses and contradicted Myers on that point. Counsel for plaintiff lay much stress on that in their briefs. We shall not take space to set out the version of Mr. Myers and of the other witnesses as to what he told them. The most favorable way to say that for plaintiff is that they succeeded in impeaching Myers with respect to what he told them. If it be conceded that they were successful in impeaching Myers, that is not evidence as to how the ice, or icy

frost, got on the pavement near the Myers premises. Counsel eventually have agreed this is the legal effect of impeaching testimony.

Considering the evidence offered on defendant's behalf as favorably to plaintiff as can reasonably be done, it does not supply the material defects in plaintiff's evidence when defendant's demurrer to it was presented and overruled. We are unable to find substantial, competent evidence in this record to sustain any judgment for plaintiff. It is axiomatic that when such evidence is lacking a verdict for plaintiff cannot stand. We find it unnecessary to consider contentions of appellant respecting alleged trial errors.

The result is, the judgment of the trial court must be reversed, with directions to enter judgment for defendant. It is so ordered.